IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL INK AND STITCH, LLC, | * | |
| 7610 Meadow Run Lane | | |
| Owings Mills, MD 20736 | * | |
| | * | |
| Plaintiff, | | Civil Action No. 18-cv-2138-CCB_ |
| | * | |
| v. | | |
| | * | |
| STATE AUTO PROPERTY AND | | |
| CASUALTY INSURANCE | * | |
| COMPANY | | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF CROSS-MOTION OF NATIONAL INK & STITCH, LLC, FOR SUMMARY JUDGMENT AND IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY**

Plaintiff National Ink & Stitch, LLC, by its undersigned attorney, submits this Memorandum in Support of its Cross-Motion for Summary Judgment and in Opposition to the Motion for Summary Judgment filed by Defendant State Auto Property and Casualty Insurance Company [Doc. 35-1].

The only legal issue presented by the cross-motions for summary judgment is whether Plaintiff National Ink & Stitch suffered a "direct physical loss" to "Covered Property" as a result of the ransomware attack it suffered in December 2016. There is no dispute: (i) that the ransomware attack "froze" and/or corrupted virtually of the data and software stored on National Ink & Stitch's computer server; (ii) that this data and software remains unusable or

inaccessible to this day; (iii) that the measures that have been used since the attack to address the effects of the ransomware and prevent its reinfection of the software and data that had to be replaced and reinstalled during the pendency of National Ink & Stitch's unsuccessful efforts to have State Auto pay its claim have caused the system to be slower and suffer a loss of functionality; (iv) that the only way to ensure that the 2016 ransomware virus likely still in the computer system does not inadvertently become reactivated so as to re-infect the new data and software is either to "wipe" the entire system and reinstall all of its software or to purchase a new server and components, and (v) that the latter option is the least expensive and least disruptive. Nor is there any dispute that the electronic data and software that was lost or corrupted is "Covered Property," under the express language of the policy. Despite this, State Auto has refused to pay National Ink's claim on the grounds that the data and software stored in the computer service is "intangible property," and, thus, cannot suffer "direct physical loss." State Auto's position is against the weight of the case law. Indeed, State Auto's own policy language must either be interpreted as treating computer data and software as tangible property capable of suffering "direct physical loss" or the first-party coverage it accords to "electronic media," as "Covered Property," is illusory.

**I.      Statement of Additional Undisputed Material Facts.**

National Ink does not dispute the facts recited in State Auto's Statement of Undisputed Facts so far as they go. The Policy says what it says. The facts set forth in State Auto's section I.B, "Plaintiff's Business and The Ransomware Event," are also essentially accurate. However, State Auto's recitation of the effects that the ransomware virus has had on National Ink's computer system and on its business have been dramatically understated by State Auto.

Those facts are set forth below.

National Ink, at all times pertinent to this case, provided logo design and printing services, and, in the course of those services, regularly created art, logos, and designs, which it stored indefinitely on its computer server, whether the design was owned by National Ink or its customer.[1] At the time of the December 2016 ransomware attack, National Ink had a file server and nine desktop computers, all of which were networked. The file server was the central location where all of the files, data, and computer programs used in the business management and production-side of National Ink's business were stored.[2] At the time of the ransomware attack, the file server contained graphic arts software (Adobe Illustrator, Photoshop, Corel Draw), shop management software (ASI Profitmaker, Shop Works), embroidery software (Pulse), and webstore management software (an ASI commercial platform), all of which was used extensively in National Ink's business operations.[3] As a direct result of the ransomware attack, none of these files, other than the embroidery software, could be opened. The ransomware attack affected virtually all file types on the computer server, including pdf, JPEG, bitmaps, and PNG files.[4] In the immediate aftermath of the ransomware attack, employees could not use any of the computers, although they came to work because they were still able to use the phones, print t-shirts, and do embroidery jobs. In late December 2016, because National Ink had no access to their computer files, the employees "were scrambling" to recreate

---

[1] Transcript of deposition of Timothy Manley, as designee for National Ink, at pages 22-23 (hereinafter "Tr. _____"). A complete copy of the Manley deposition transcript is Exhibit B to State Auto's summary judgment motion.
[2] Tr. 26-27; 32-33.
[3] Tr. 42-45.
[4] Tr. 54-55.

3

existing orders that had been stored on the file server. Mr. Manley described it as "chaos."[5]

National Ink was able to access the computers (but not the "locked" data and software, which have largely never been accessed or restored) approximately a week after the attack, after eTrepid, a computer services company, installed multiple security and monitoring measures on the system to prevent re-emergence of the ransomware virus.[6] However, from that time until the present, the system is much slower and efficiency is "way down."[7] National Ink still cannot access the affected files, including the numerous art files it had created and stored over the course of its business operations, which it must attempt to recreate.[8]

There is no dispute that the only way to ensure that the 2016 ransomware malware virus is not reactivated in the National Ink computer system is either to replace the entire system or to remove the current infected system, take it offsite to a computer specialist, such as eTrepid, where it can be "wiped" and all programs reformatted and reinstalled. Nor does there appear to be any dispute that replacing the system is the least disruptive and less expensive solution. For example, in the December 15, 2017, letter from State Auto's Ashley Manning to Mr. Manley denying the claim, which is Exhibit E to State Auto's motion for summary judgment, she summarizes those options as follows:

> Finally, we were notified eTrepid is recommending the replacement of computer equipment due to the attack. We discussed the this [sic] recommendation with Thomas Blandford [of eTrepid], and he advised they have done as much as they can (scans, filtering, etc.) and put as much protection in place to keep anything from getting onto the system from the outside. His concern is there is no

---

[5] Tr. 63, 79.
[6] Tr. 80-81.
[7] Tr. 81.
[8] Tr. 82. Only 300-400 of those art files have been recreated. Id.

4

guarantee that something isn't dormant on the system, which simply has to be clicked to re-infect the entire system.

They recommend the replacement of all hardware, as that is more cost effective than the other option at their disposal. The only other option to eradicate any chance of a dormant file re-infecting the system is to wipe all systems clean, reimage and rebuild the system. Due to the labor intensive work, the business would be down for about 2 weeks plus the cost of rebuilding the system. This would more than likely exceed the cost of replacing the hardware.

Mr. Blandford believes there is still an infected file somewhere, but they would have to wipe all files to confirm that they located it. ***However, it is our understanding that the system is fully-operational, therefore replacing the equipment is a preventative measure and not the result of direct, physical damage to the computer hardware.*** [Emphasis added].

State Auto has never contested that the ransomware infection happened or National Ink's inability to access virtually all of its software, files and data on the file server as a result. Instead, State Auto's position has been consistent, from Ashley Manning's December 2017, denial letter quoted above, to State Auto's current motion for summary judgment, that, because the computer hardware is still "fully operational," even if the data on it cannot be accessed and there is likely still a destructive virus lurking on a file stored on the file server, there has been no "direct physical loss" to "Covered Property," because the loss or damage was to software or data, which State Auto asserts is "intangible" and, thus, incapable of suffering a "physical loss."

As explained more fully below, the trend in the case law is plainly counter to State Auto's position, as is Maryland's treatment of computer software as "tangible property" subject to sales tax. Because there is no dispute that the software, files and data stored on its file server were damaged or destroyed, and the functionality of the computer system has been

5

diminished, National Ink is entitled to judgment, as a matter of law, that it has suffered a direct physical loss to "Covered Property," as those terms are used in the applicable State Auto policy. Indeed, either State Auto's own policy language must be interpreted to allow software to suffer "direct physical loss" or the first-party coverage it accords to "electronic media" is illusory.

**II.    Argument.**

State Auto's argument on non-coverage for National Ink's ransomware-related losses is one-note: Computer data, software, and files, even if stored on a hard drive, "are intangible, and, as such, [are] not susceptible to physical loss." *Memo*, at p. 7. State Auto relies primarily on *Ward General Insurance Services, Inc. v. Employers Fire Insurance Company*, 7 Cal. Rptr. 3d 844 (Cal. App. 2003).[9] *Ward* involved first-party coverage for labor expenses to recover from a computer crash and lost income during the period of recovery. The crash was either caused by a negligent operator or defective software. The *Ward* court concluded that loss of the data on the computer was "the loss of organized information . . .[and] we fail to see how *information, qua* information, can be said to have a material existence, be formed out of tangible matter, or be perceptible to the sense of touch. . . Here, the loss suffered by plaintiff was a loss of information, i.e., the *sequence* of ones and zeroes stored by aligning small domains of magnetic material on the computer's hard drive in a machine readable manner." 114 Cal. App. 4th 548, 556 (2003) (italics in original).

The result and/or reasoning in *Ward* has been rejected by other courts, particularly in the federal courts. For example, in *American Guaranty & Liability Insurance Company v.*

---

[9]    *Ward*, decided in 2003, is the most recent of the three cases relied on by State Auto for its assertion that software and files stored on computers are "intangible" and, thus, cannot be the subject of "direct physical loss."

6

*Ingram Micro, Inc.*, 2000 WL 726789 (D. Az. 2000), Ingram, the insured business, processed all of its orders through a computer network, the Impulse System, at its central data center. Because of a ground fault in the electric system at the data center, all of the computers stopped working and the mainframe computers lost the programming data stored in its memory, so that it had to be reloaded. Ingram's operations were up and running eight hours later. However, the programming software continued to require reprogramming for several days thereafter. Like State Auto here, the property insurer refused to pay the claim because the computer hardware was not physically damaged and the power outage did not adversely affect the equipment's inherent ability to accept and process data once the configuration settings were reprogrammed. 2000 WL 726789 *2. Ingram, the insured, argued that "physical damage" to the computer system included the loss of its use and functionality. *Id.* The Court agreed with the insured, holding that the loss of the configuration and programming data from the power outage constituted "physical damage" that was covered. *Ingram, supra* at *2,4. As the Court explained:

> At a time when computer technology dominates our professional and well as personal lives, the Court must side with Ingram's broader definition of "physical damage." The Court finds that "physical damage" is not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss or use, and loss of functionality.

*Igram, supra* at *2. *Accord, Southeast Mental Health Center, Inc. v. Pacific Insurance Company, Ltd.*, 439 F. Supp. 2d 831, 837-38 (W.D. Tenn. 2006) [loss of data stored on pharmacy computer from storm-related loss of electrical power, without physical damage to computer itself, was "direct physical loss of or damage to property" under first-party property policy, adopting reasoning in *Ingram*]; *Ashland Hospital Corporation v. Affiliated FM*

*Insurance Company*, 2013 WL 4400516 * 5 [loss of reliability of data storage from excessive heat exposure was "direct physical loss or damage" covered under property policy]. *See also, Wakefern Food Corporation v. Liberty Mutual Fire Insurance Company*, 406 N.J. Super. 524, 968 A. 2d 724 (Sup. Ct. App. Div. N.J. 2009) [undefined term "physical damage" in policy was ambiguous and electrical grid was "physically damaged" because, due to a series of incidents, it was "physically incapable of performing [its] essential function of providing electricity," even if that was not because of some actual damage to the grid itself].

Other courts have expressly held that data stored on a hard driver, server, or other storage medium is tangible property, irrespective of whether the functionality of the computer on which it is stored lost functionality when the data was damaged or destroyed. In *Landmark American Insurance Company v. Gulf Coast Analytical Laboratories, Inc.*, 2012 WL 1094761 (M.D. La. 2012), the insured business analyzed chemical samples and stored all of its data on a computer system, which failed to read two hard drive discs resulting in corruption of the data stored on the discs. The insurer, like State Auto here, refused to pay the claim on the ground that the data that was corrupted was not physical. The Court disagreed, concluding that, even if data was not "tangible," it was certainly "physical," because it "has physical existence, takes up space on the tape, disc, or hard drive, makes physical things happen, and can be perceived by the senses." 2012 WL 1094761 *4 (internal citation omitted). The Louisiana federal court relied on the decision of the Louisiana Supreme Court, in *South Central Bell Telephone Co. v. Barthelemy*, 643 So. 2d 1240 (La. 1994), which held that software was "tangible personal property" and, thus, subject to sales tax, because:

8

> When stored on magnetic tape, disc, or computer chip, this software, or set of instructions, is physically manifested in machine readable form, by arranging electrons, by use of an electric current, to create either a magnetized or unmagnetized space . . . this machine readable language or code is the physical manifestation of the information in binary form.

*Id.* at 1246. The *South Central* Bell Court elaborated that "one cannot escape the fact that software, recorded in physical form, becomes inextricably intertwined with, or part and parcel of the corporeal object upon which it is recorded, be that a disk, tape, hard drive, or other device." *Id.* at 1247. Significantly, although Maryland's courts have not addressed the issue of whether software is tangible or physical property in the context of property insurance coverage, software has been held by the Court of Appeals to be tangible personal property subject to sales tax. *Comptroller of the Treasury v. Equitable Trust Company*, 296 Md. 450, 484, 464 A. 2d 248, 261 (1983). *See also, NMS Services Incorporated*, 62 Fed. Appx. 511 (4th Cir. 2003)(unpublished, Va. law) [holding that erasure of data bases and vital computer files by disgruntled ex-employee hacker was "direct physical loss of or damage to" computer for purposes of coverage]; *First American Bankcard, Inc. v. Smart Business Technology, Inc.*, 2016 WL 5869787 (E.D. La. 2016) (computer programs stored on disc, server, or hardware were tangible property capable of being converted by defendants).

Perhaps the most cogent reason why State Auto's position should be rejected is the actual language of its policy. As State Auto itself agrees, the "Policy provides coverage for 'direct physical loss of or damage' to Covered Property, caused by or resulting from a Covered Cause of Loss," per the Businessowners Special Property Coverage Form BP 00 02. [10] *Memo* at

---

[10] State Auto does not argue that the malware attack is not a "Covered Cause of Loss."

9

p. 7.   The pertinent language of that Coverage Form, found at page 35 of Exhibit A to State Auto's summary judgment motion, provides that:

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

As State Farm also agrees, what constitutes "Covered Property" in the main coverage form, the BP 00 02, quoted above, was amended by the Businessowners Special Form Computer Coverage endorsement, BP 0434C, which is at pages 61 and 62 of Exhibit A.  That Computer Coverage endorsement expressly includes, as "Covered Property," not only computer hardware but also "Electronic Media and Records (Including Software)," and it defines "Electronic Media and Records" to include "Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells, as well as ***Data stored on such media . . . .***" Section A.b(2) (emphasis added).

State Farm appears to concede that the data and files stored on the National Ink file server are "Covered Property" within this definition.   If, as State Auto asserts, computer files and data stored on a computer file server are not tangible or physical property capable of suffering "physical loss," then such computer files or computer data would never be covered for loss or damage under this policy, despite being expressly defined as "Covered Property" that would otherwise be within the insuring agreement of the main property coverage form, BP 00 02.  Thus, either State Auto's own policy must be deemed to consider such computer data and files as physical or tangible property capable of suffering a "direct physical loss or damage," or the property coverage purportedly extended by State Auto to such computer data and files is wholly illusory. *See, Lambrecht & Associates v. State Farm Lloyd's*, 119 S. W. 3d 16, 26 (Tex.

10

2003) [holding that loss of computer data was covered under property policy because it provided for payment of "direct physical loss" to covered property, which definition expressly included "electronic media and records."].

## III. Conclusion.

For all of the reasons discussed above, National Ink & Stitch, LLC, is entitled, as a matter of law, to summary judgment in its favor and to a declaration that the ransomware attack caused it to suffer a "direct physical loss of or damage to" its "electronic media and records," as defined by the applicable State Auto policy, which is "Covered Property" under that policy. For the same reasons, State Auto Property and Casualty Insurance Company's motion for summary judgment should be denied.

                                                                                         /s/   Kathleen M. McDonald
Kathleen M. McDonald
Federal Bar No. 00764
Kerr McDonald, LLP
111 South Calvert Street, Suite 1945
Baltimore, Maryland 21202
(410) 539-2900
(410) 539-2956 (FAX)
kmcdonald@kerrmcdonald.com

*Attorney for Plaintiff National Ink and Stitch, LLC*

M4929.docx